**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| DION PIGOTT, | ) | CASE NO: 1:14-CV-1148 |
| | ) | |
| Plaintiff, | ) | JUDGE LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| HORNBACK, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **REPORT AND RECOMMENDATION** |

**I.**

This case is before the undersigned United States Magistrate Judge upon referral for the preparation of a Report and Recommendation on the motion for summary judgment (the "motion") filed by Defendants Mansfield police officers Stephen Hornback, Larry Schacherer, and Andrew Boor; Mansfield police sergeant Doug Noblet; Mansfield police chiefs Dino Sgambellone and Kenneth Coontz; and John and Jane Doe Officers 1-10 (collectively, "Defendants"). (Doc. No. 17.)  Plaintiff Dion Pigott ("Plaintiff") filed a complaint (the "Complaint") alleging that Defendants, in their individual capacities, violated his constitutional rights under the Fourth and Fourteenth Amendments to the U.S. Constitution in violation of 42 U.S.C. § 1983.  The Complaint also alleges constitutional claims against Defendants in their official capacities and two state law claims, *i.e.*, intentional infliction of emotional distress and negligent, willful, wanton, reckless, and intentional misconduct.   Defendants' motion challenges only the constitutional claims against Defendants in their individual capacities.

For the reasons set forth below, the Magistrate Judge recommends that Defendants' motion be GRANTED in part and DENIED in part, that is: (1) all constitutional claims asserted against Defendants Boor, Noblet, Sgambellone, Coontz, and John and Jane Doe Officers (1-10) in their individual capacities should be dismissed; (2) to the extent Plaintiff asserts a claim for unreasonable seizure based upon his initial encounter and flight from police that led to his conviction in municipal court for obstructing official business and resisting arrest, the claim should be dismissed; and (3) the excessive force claim against Defendants Hornback and Schacherer in their individual capacities should survive.[1]

**II.**

### A.    Factual Background

The following facts are undisputed, unless otherwise noted below.  Shortly after midnight on May 31, 2012, an armed robbery occurred at a BP gas station in Mansfield, Ohio. (Deposition of Dion Pigott (Pigott Dep.), Doc. No. 17-2 at 47.)  A man held up a patron and a gas station clerk at gunpoint and demanded money. (Suppression Hearing Transcript (Supp. Tr.), Doc. No. 21-11 at 529.[2])  The clerk described the perpetrator as

---

[1]    The Complaint alleges causes of action against the Defendants in their official and individual capacities. A suit against an employee of a political subdivision in the employee's official capacity is treated as a suit against the political subdivision. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).  A municipality is not entitled to qualified immunity as that doctrine safeguards natural persons in their individual capacities. *See Scott v. Clay Cty., Tenn.*, 205 F.3d 867, 879-80 (6th Cir. 2000). For this reason and the for the reason that the parties have not brief a claim against a municipality, this Report and Recommendation addresses only the § 1983 claim against Defendants in their individual capacities.

[2]    In order to avoid citing to duplicate page numbers in the Suppression Hearing Transcript, the Court has cited to the court-assigned "Page ID" numbers.

-2-

wearing dark pants or jeans, a light-colored hooded sweatshirt, and a mesh mask over his face. (Supp. Tr., Doc. No. 21-11 at 575.)  In the clerk's estimation, the robber was five feet, eight inches tall and weighed approximately 160 to 200 pounds. (*Id.*)

Hornback promptly responded to the scene and watched a video recording of the crime. (Trial Transcript (Trial Tr.), Doc. No. 17-6 at 109-10.)  He testified that the robber had the hood of his sweatshirt pulled over his head with the bill of a yellow hat showing under the hood. (Supp. Tr., Doc. No. 21-11 at 540.)  Based on the video, Hornback estimated that the robber was approximately six feet tall and weighed 220 to 240 pounds. (Deposition of Stephen Hornback (Hornback Dep.), Doc. No. 17-1 at 90.)  The clerk later agreed, however, that Plaintiff and the suspect were of a similar build and height. (Supp. Tr., Doc. No. 21-11 at 579.)  She also indicated that Plaintiff could be a few inches taller or shorter than five foot eight. (*Id.*) The suspect and Plaintiff were both African American. (Trial Tr., Doc. No. 17-6 at 53, 112.)

Hornback left the gas station and canvassed the area in his police cruiser in an attempt to locate the robber. (Trial Tr., Doc. No. 17-6 at 111.)  About 30 to 35 minutes after the robbery occurred, Hornback saw a man, later identified as Plaintiff, traveling on foot within a mile of the gas station. (*Id.* at 112-14; Hornback Dep., Doc. No. 17-1 at 68.)  Hornback decided to stop Plaintiff and testified that he believed Plaintiff could have been the perpetrator because he matched the perpetrator's build and race, was wearing what appeared to be a yellow hat, and was in the area where the robbery transpired. (Trial Tr., Doc. No. 17-7 at 112-14, 138-39; Hornback Dep., Doc. No. 17-1 at 96; Supp. Tr., Doc. No. 21-11 at 543-44.)  Plaintiff disputes Hornback's conclusion that Plaintiff could have been the perpetrator of the BP robbery because Plaintiff did not fit

-3-

the original description given by the clerk, was not wearing the same clothing as the perpetrator, and was wearing a cap with a white, not yellow, bill.[3]

Hornback testified that when he first encountered Plaintiff, he shouted from his cruiser window for Plaintiff to stop. (Trial Tr., Doc. No. 17-6 at 114.)  According to Hornback, Plaintiff looked directly at him, turned away, and began to run between a group of houses. (*Id.*)  Hornback circled his car and again yelled for Plaintiff to stop, but Plaintiff did not yield. (*Id.* at 114-15.)  Boor met Hornback and the two patrolled the area on foot with Hornback's K-9, Astor. (*Id*. at 115.)  The officers heard Plaintiff running between houses. (*Id.*)  Hornback yelled, "Stop you're under arrest.  Dog's out."[4] (*Id.*)  Plaintiff did not stop. (*Id.*)  Plaintiff denies that Hornback shouted for him to stop from his cruiser window. (Supp. Tr., Doc. No. 21-11 at 583.)  Plaintiff has presented no evidence contradicting that Hornback later shouted that Plaintiff was under arrest.

Plaintiff acknowledged that he fled from police and provided various justifications for his flight. (Dion Pigott Deposition (Pigott Dep.), Doc. No. 17-2 at 67-69.)  For example, on one occasion, Plaintiff claimed that he fled because he was intimidated and fearful, it was dark outside, and he had a prior negative encounter with Hornback involving an arrest. (Supp. Tr., Doc. No. 21-11 at 584.)  Defendants challenge Plaintiff's assertion that Hornback was involved in the prior arrest. (Defendants' Brief, Doc. No. 17 at 4; Pigott Dep., Doc. No. 17-2 at 63-64.)  At the suppression hearing, Plaintiff denied

---

[3]  Unlike the perpetrator, Plaintiff was wearing a white t-shirt and red shorts. (Trial Tr., Doc. No. 17-7 at 112.)

[4]  According to Hornback, having the dog out or "deploying" the dog meant that the dog was out of the car, but remained on a leash. (Hornback Dep., Doc. No. 17-1 at 44.)

that he ran due to an outstanding warrant. (Supp. Tr., Doc. No. 21-11 at 586-88.)   On other occasions, Plaintiff has maintained that he indeed ran because of an outstanding warrant for his arrest and because he did not want to go to jail. (Pigott Dep., Doc. No. 17-2 at 62.)  Plaintiff has also claimed that he wanted to avoid police activity in the area. (Complaint, Doc. No. 1 at ¶ 25.)

After Plaintiff fled, Hornback and Boor departed in separate patrol cars in an attempt to locate Plaintiff. (Trial Tr., Doc. No. 17-6 at 115-16; Hornback Dep., Doc. No. 17-1 at 72.)  Hornback eventually set out on foot with his K-9, and as they approached a house, the dog began to bark. (Trial Tr., Doc. No. 17-6 at 116-17.)  Hornback rotated his flashlight over the side of the house and saw Plaintiff facedown on the ground. (*Id*. at 117.)  The parties' versions of events differ significantly as to what occurred at this point.  Hornback indicated that he believed Plaintiff may have been in possession of a firearm. (Hornback Dep., Doc. No. 17-1 at 51.)  According to Hornback, he twice ordered Plaintiff to show his hands. (Trial Tr., Doc. No. 17-6 at 117.)  When Plaintiff did not comply, Hornback commanded the dog to "apprehend." (*Id.*)  The dog bit Plaintiff on the right thigh, and Plaintiff began to roll and kick the dog. (Hornback Dep., Doc. No. 17-1 at 76.)  Hornback ordered Plaintiff to stop kicking and placed a knee on his back to hold him down. (*Id.*)

According to Defendants, Schacherer arrived at the scene while the dog was biting Plaintiff and he assisted in handcuffing Plaintiff. (Hornback Dep., Doc. No. 17-1 at 76; Deposition of Larry Schacherer (Schacherer Dep.), Doc. No. 17-3, at 19-20; Supp. Tr., Doc. No. 21-11 at 550-51; Trial Tr., Doc. No. 17-6 at 118.)  Once Plaintiff was secured with handcuffs, an officer commanded the dog to release. (Hornback Dep.,

Doc. No. 17-1 at 77-78.) Boor testified that he was not present when Plaintiff was apprehended. (Trial Tr., Doc. No. 17-6 at 63.)

Plaintiff disputes Defendants' account of what occurred while he was on the ground against the house. According to Plaintiff, as officers approached him, he showed them his hands and called out, "I'm right here. I'm over here." (Pigott Dep., Doc. No. 17-2 at 81.) Two officers walked up to Plaintiff and one officer handcuffed him. (*Id.* at 80.) Plaintiff heard the officers say: "Let's not take him in yet. Let's let the dog get him." (*Id.* at 78, 88.) Plaintiff remained handcuffed on the ground until Hornback arrived with his K-9. (*Id.* at 84, 87.) After an officer removed the handcuff from Plaintiff's right hand, Hornback released the dog. (*Id.* at 85.) The dog bit and mauled Plaintiff's leg. (*Id.*) At some point, Hornback put his knee on Plaintiff's back and instructed that if Plaintiff stopped moving and was quiet, he would remove the dog. (*Id.* at 89-90.) After the dog released Plaintiff's leg, the officers handcuffed Plaintiff, took him to a police cruiser, and patted him down. (*Id.* at 90-91.)

Plaintiff was charged with obstructing official business pursuant to Mansfield Codified Ordinance § 525.07 and resisting arrest pursuant to § 525.09 in the Mansfield Municipal Court, Case No. 2012-CRB-02774.[5] (Supp. Tr., Doc. No. 21-11 at 545; Trial Tr., Doc. No. 17-6 at 11-12; Defendants' Brief, Doc. No. 17 at 13.) Plaintiff filed a suppression motion and the court conducted a hearing regarding the stop and arrest. (Supp. Tr., Doc. No. 21-11 at 528, 545-46, 551.) The court apparently overruled

---

[5] *Mansfield Police Dept. v. Dion Pigott*, Case No. 2012-CRB-02774. Docket *available at* http://gov.courtview.com/OH.Richland.Mansfield/CaseDetail/default.aspx?csnr=2012CRB02774.

Plaintiff's suppression motion. (Defendants' Brief, Doc. No. 17 at 6 n.1.) The matter proceeded to trial and a jury found Plaintiff guilty of both offenses. (Trial Tr., Doc. No. 17-6 at 171.) The parties do not indicate which conduct forms the basis for each charge. It is clear, however, from the transcripts of the suppression hearing and trial that the basis for the obstruction charge was Plaintiff's flight and failure to comply with Hornback's first order to stop.[6] (Supp. Tr., Doc. No. 21-11 at 545-46; Trial Tr., Doc. No. 17-6 at 19-20, 144, 150, 158.) The basis for the resisting arrest charge was Plaintiff's flight after Hornback informed him that he was under arrest and required to stop. (*Id.*) Neither conviction relied upon Plaintiff's encounter with the dog or officers at the time he was apprehended at the house.

### B. Procedural Background

The first cause of action in the Complaint is captioned as "42 U.S.C. § 1983-Excessive Force" and alleges that Defendants violated Plaintiff's right to be free from excessive force and unreasonable seizure. In a conclusory fashion, it alleges that the Defendants violated Plaintiff's rights "by either using excessive force directly on Mr. Pigott causing his injuries or by engaging in a custom, policy or practice of using excessive force on citizens and/or ratifying the use of excessive force and/or failing to supervise or discipline those who use excessive force on citizens." (Complaint, Doc. No. 1 at ¶ 76.) The factual background to the Complaint alleges specific conduct only by

---

[6]     During the suppression hearing, Hornback explained the grounds for the obstructing official business and resisting arrest charges. (Supp. Tr., Doc. No. 21-11 at 545-46.) During Plaintiff's trial, counsel for the City of Mansfield also discussed the factual basis for each charge in his opening statement, comments to the judge, and closing argument. (Trial Tr., Doc. No. 17-6 at 19-20, 144, 150, 158.)

Boor, Hornback, and Schacherer.  It alleges that: (1) Boor, Hornback, and Schacherer were on the scene at the time Astor apprehended Plaintiff, (2) Boor "seized" Plaintiff, (3) Hornback was Astor's K-9 handler, and Astor, under Hornback's control, attacked and bit Plaintiff after Hornback put his foot on the small of Plaintiff's back, and (4) during the time Astor was biting Plaintiff, Boor, Hornback, and Schacherer did nothing to prevent the excessive and unreasonable use of force. (Complaint, Doc. No. 1 at ¶¶ 38, 42, 44, 51.)

The Complaint does not allege any specific conduct regarding John or Jane Does.  The case management order in this case set forth a deadline of December 31, 2014, to add parties and amend the pleadings. (Case Management Order, Doc. No. 11 at 2.)  Plaintiff has not named as parties or identified any John or Jane Does.

On September 5, 2014, the Court granted the parties an initial period of discovery limited to the issue of qualified immunity with the anticipation that Defendants would file a motion for summary judgment. (Case Management Order, Doc. No. 11 at 3.)  Defendants subsequently filed their summary judgment motion, which asserts that Hornback, Boor, Schacherer, Noblet, Sgambellone, Coontz, and John and Jane Doe Officers (1-10) are entitled to qualified immunity. (Defendants' Brief, Doc. No. 17 at 1.)

Defendants' motion for summary judgment argues that (1) Defendants Boor, Noblet, Sgambellone, and Coontz should be dismissed because Plaintiff has failed to come forward with any evidence that these Defendants directly or indirectly participated in any alleged unconstitutional activity; and (2) Defendants Hornback and Schacherer should be dismissed because the officers: (a) acted reasonably in seizing Plaintiff and (b) did not use excessive force. (*Id.* at 10-20.)  With regard to Hornback and

-8-

Schacherer, the motion suggests that there was not an unreasonable seizure because Plaintiff was charged with, and a jury convicted him of, resisting arrest and obstructing official business in municipal court. (*Id.* at 13; Trial Tr., Doc. No. 17-6 at 11-12, 171.) The motion for summary judgment treats Plaintiff's claim as primarily an excessive force claim.

In response to the motion for summary judgment, Plaintiff does not challenge the dismissal of the John or Jane Doe defendants or of any of the named defendants other than Hornback and Schacherer.  While it is not entirely clear whether the Plaintiff is attempting to re-litigate the validity of police attempts to stop and arrest him before he stopped running from the police, it is clear that Plaintiff challenges the reasonableness of the police force and conduct at the time officers found him lying in the grass near the house and unleashed Astor.

### III.

### A.    The Implication of Plaintiff's Convictions

While Defendants' motion for summary judgment treats Plaintiff's § 1983 claim largely as an excessive force claim, Defendants assert that they lawfully seized Plaintiff and the lawful seizure is established by Plaintiff's convictions for obstructing official business and resisting arrest in municipal court. (Defendants' Brief, Doc. No. 17 at 13.) In his opposition, Plaintiff appears to re-litigate whether officers had cause to lawfully stop, detain, or arrest him. (Plaintiff's Brief, Doc. No. 21 at 7-9.)

Defendants' argument regarding the effect of Plaintiff's conviction in relation to the seizure implicates the Supreme Court's ruling in *Heck v. Humprey*, 512 U.S. 477

-9-

(1994).  In *Heck* the Supreme Court held that a plaintiff cannot recover under § 1983 when the basis for the claim necessarily implicates the invalidity of a previous criminal conviction. *Id.* at 486-87.  As an example, the Court directly addressed the preclusive effect of a resisting arrest conviction in the context of an unreasonable seizure. *Id.* at 487 n.6.  The Court explained that a criminal defendant who is convicted of resisting arrest, which is commonly defined as "intentionally preventing a peace officer from effecting a lawful arrest," cannot bring a § 1983 action alleging that the arresting officer violated his Fourth Amendment right to be free from unreasonable seizures. *Id.*  Any recovery would necessarily mean that the arrest was not lawful, which would negate an element of the conviction. *Id.*

Plaintiff's unlawful seizure claim is a classic example of a claim that *Heck* bars.  A jury convicted Plaintiff of resisting arrest pursuant to Mansfield Codified Ordinances § 525.09.  Section 525.09 provides that, "No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another."[7]  Thus, Plaintiff's conviction for resisting arrest required that the underlying arrest be lawful.[8]  The transcripts of the suppression hearing and trial make clear the resisting arrest conviction was based on

_____

[7]   Mansfield Code of Ordinances, Resisting Arrest § 525.09, *available at* http://whdrane.conwaygreene.com/NXT/gateway.dll?f=templates&fn=default.htm &vid=whdrane:OHMansfield.

[8]   A lawful arrest is an element of resisting arrest under Ohio Revised Code § 2921.33(A). *See Hicks v. Barberton Police Dep't*, No. 5:11-CV-76, 2012 WL 5833565, at *4 (N.D. Ohio Nov. 15, 2012) (Lioi, J.).  The Ohio Revised Code and Mansfield Ordinance define the crime of resisting arrest using the same language.  In addition, the jury instructions in the municipal court case made it clear that in order to convict Plaintiff of resisting arrest, the arrest had to be lawful. (Trial Tr. 17-6 at 163.)

-10-

Plaintiff's initial encounter and flight from police after Hornback informed Plaintiff that he was under arrest and required to stop. (Supp. Tr., Doc. No. 21-11 at 545-46; Trial Tr., Doc. No. 17-6 at 144, 158.)   If Plaintiff were to prevail on his § 1983 claim for an unlawful seizure at the time he fled from arrest, it would necessarily undermine his conviction as it would undercut the jury's determination that officers lawfully arrested Plaintiff.  Accordingly, Plaintiff's unlawful seizure claim is precluded by *Heck*.

Similarly, relying on the analysis in *Heck*, Plaintiff's conviction for obstructing official business precludes a claim for a *Terry* violation.  Pursuant to *Terry v. Ohio*, 392 U.S. 1, 30 (1968), an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has reasonable suspicion that criminal activity is afoot.  During Plaintiff's trial, the municipal court judge instructed the jury that in order to find a defendant guilty of obstructing official business the jury must find "an act was done by the Defendant with the purpose to prevent, obstruct or delay a public official that hampered or impeded that public official while the official was acting in the performance of a lawful duty and the Defendant did that act without a privilege to do so. . . . The refusal to obey a police officer's request to stop while the officer investigated a crime he reasonably believes may have occurred would constitute an act."[9] (Trial Tr., Doc. No. 17-6 at 162-63.)  Plaintiff's flight after Hornback's first order to stop was the

---

[9]    Mansfield Code of Ordinances § 525.07(a) defines obstructing official business as: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." *Available at* http://whdrane.conwaygreene.com/NXT/gateway.dll?f=templates&fn=default.htm &vid=whdrane:OHMansfield.

basis for the obstruction charge. (Supp. Tr., Doc. No. 21-11 at 545.)  A challenge to the lawfulness of Hornback's first order for Plaintiff to stop, and Plaintiff's failure to yield to that order, would necessarily undermine Plaintiff's conviction for obstructing official business.  Thus, Plaintiff's claim for an unlawful seizure based on Hornback's first order to stop should also be dismissed.

### B.    Summary Judgment

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party can meet this burden in two ways:  by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing that the nonmoving party, after adequate time for discovery, fails to show sufficient evidence to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but must set forth through competent and material evidence of specific facts showing that there is a genuine issue for trial. *See Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  The trial court has no duty to search the entire case record to establish that it is bereft of a genuine issue of material fact. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989).  The nonmoving party has an affirmative duty to direct the court's attention to specific evidence upon which it seeks to rely.  *Al-Qudhai'een v. Am. W. Airlines, Inc.*,

267 F. Supp. 2d 841, 845 (S.D. Ohio 2003) (citing *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)).  The lack of such a response by the nonmoving party may result in an automatic grant of summary judgment. *Reeves v. Fox Television Network*, 983 F. Supp. 703, 709 (N.D. Ohio 1997).

In reviewing summary judgment motions, a court must view all facts and inferences drawn therefrom in a light most favorable to the nonmoving party. *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496, 498 (6th Cir. 1990).  However, the Court does not weigh the evidence or make credibility determinations. *Joostberns v. United Parcel Services, Inc.*, 166 F. App'x 783, 787 (6th Cir. 2006).  Moreover, the mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  In other words, the court should determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251.

**C.    Qualified Immunity**

Defendants argue that they are entitled to qualified immunity because Plaintiff has failed to prove that Defendants violated his constitutional rights.  More specifically, Defendants argue that Plaintiff has failed to prove that Boor, Noblet, Sgambellone, and Coontz engaged in any unconstitutional activity, and Plaintiff has failed to show that any of Hornback or Schacherer's actions were unlawful.

The defense of qualified immunity shields government officials performing

-13-

discretionary functions where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This defense can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss. *English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir.1994).

The two-part test for qualified immunity asks (1) whether the facts that a plaintiff has alleged make out a violation of a constitutional right; and (2) if so, whether the right at issue was clearly established at the time of the defendants' alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009). The court may consider the two parts of the test in any order it deems appropriate, and the court may conclude its analysis upon answering either part of the test in the negative. *Id.* at 239-41. In determining whether the facts alleged make out a violation of a constitutional right, a court must ask whether, viewed in the light most favorable to plaintiff, the alleged facts show the officer violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194 (2001). In determining whether the right at issue was clearly established at the time of the defendants' alleged misconduct, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.  The Court will address each of Defendants' arguments regarding qualified immunity in turn.

### 1. Constitutional Claims Against Defendants Boor, Noblet, Sgambellone, and Coontz in Their Individual Capacities

In their motion for summary judgment, Defendants argue that Boor, Noblet, Sgambellone, and Coontz cannot be individually liable because Plaintiff has failed to

come forward with evidence that these Defendants directly or indirectly participated in any unconstitutional activity. (Defendants' Brief, Doc. No. 17 at 10-11.)  Plaintiff does not challenge the dismissal of claims against Boor, Noblet, Sgambellone, or Coontz in his opposition.

To succeed on a § 1983 claim against a government official in his individual capacity, and to overcome a qualified immunity defense, a plaintiff must demonstrate a defendant's direct personal involvement in the activities that allegedly violated the plaintiff's constitutional rights. *See Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  It is well established that liability in a § 1983 action cannot be based on a theory of *respondeat superior*. *Id.*  A plaintiff must prove "that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)).

To avoid summary judgment, Plaintiff must come forward with specific evidence, beyond the pleadings, that shows there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324.  Plaintiff has presented no evidence that Noblet, Sgambellone, or Coontz participated in any of Plaintiff's encounters with police on May 31, 2012.  The allegations of Plaintiff's Complaint indicate that Noblet, Sgambellone, and Coontz have been sued because they are supervisors.  The Complaint identifies Noblet as a "sergeant and supervisor" and Sgambellone and Coontz as "police chief[s]" and "policy maker[s]," but otherwise makes no specific allegations with regard to these defendants

-15-

in their individual capacities. (Complaint, Doc. No. 1 at ¶¶ 8-10.)  These three defendants cannot be liable based on a theory of *respondeat superior*.  As Plaintiff has not come forward with evidence that Defendants Noblet, Sgabellone, and Coontz participated in any unconstitutional activity, the claims against them should be dismissed.

Boor is in a slightly different, but nevertheless analogous, situation: the Complaint alleges some specific activities against him.  Regarding Boor's conduct, however, the only evidence submitted to the Court demonstrates that Boor was not present when officers handcuffed Plaintiff or when Astor apprehended Plaintiff.  The uncontroverted evidence pertaining to Boor is that:  (1) Hornback and Boor were the only officers present during Plaintiff's initial encounter with police when Plaintiff was traveling on foot and fled from police (Trial Tr., Doc. No. 17-6 at 114.); and (2) Hornback and Schacherer were the only officers at the scene on the side of the house. (Hornback Dep., Doc. No. 17-1 at 76; Schacherer Dep., Doc. No. 17-3 at 19-20.) Regarding the house encounter, the evidence shows that Hornback released Astor, Schacherer arrived while Astor was biting Plaintiff, and Schacherer assisted Hornback with handcuffing Plaintiff. (*Id.*)  Boor affirmed that he was never at the scene during the house encounter. (Trial Tr., Doc. No. 17-6 at 63.)  Although Boor was present when Hornback first shouted that Plaintiff was under arrest, Boor cannot be liable for any alleged constitutional violations that resulted from this encounter because (1) Plaintiff was convicted of resisting arrest and obstructing official business as discussed in Section III.A above, and (2) Plaintiff fails to allege any specific conduct on Boor's part and Boor cannot be liable on the basis of *respondeat superior*.  Plaintiff has not

directed the Court to any evidence showing that Boor either was at the house or participated in any way when officers found and handcuffed Plaintiff and released Astor to apprehend him.  As Plaintiff may not rest upon his pleadings and has failed to come forward with evidence that Boor used excessive force against him, the claims against Boor in his individual capacity should be dismissed.

> **2.      Constitutional Claims Against Hornback and Schacherer in Their Individual Capacities**

Defendants assert that the use of a K-9 to apprehend Plaintiff was objectively reasonable. (Defendants' Brief, Doc. No. 17 at 17-20.)  To support this conclusion, Defendants argue that (1) Hornback believed Plaintiff was the perpetrator of a recent armed robbery, and therefore, officers had an objectively reasonable belief that Plaintiff possessed a gun or other weapon on his person; (2) Plaintiff had fled from police and was hiding in a residential area, posing a potential threat to officers' and others' safety; and (3) the release of Astor to apprehend Plaintiff, who was hiding in a dark, grassy area and refused to comply with Hornback's orders to show his hands, was reasonable. (*Id.*)

Plaintiff counters that there is a factual dispute, and for the purpose of summary judgment, the Court must accept his version of events that supports the conclusion that officers deployed the K-9 as an unreasonable and gratuitous use of force. (Plaintiff's Brief, Doc. No. 21 at 18-20.)

Courts analyze claims that police officers used excessive force in the course of an arrest under the Fourth Amendment's "objective reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *Ciminillo v. Streicher*, 434 F.3d 461,

-17-

464-65 (6th Cir. 2006) (citing *Graham*, 490 U.S. at 395) ("[A]ll claims that police officers used excessive-force in the course of an arrest, investigatory stop, or other seizure should be analyzed under the rubric of the Fourth Amendment as opposed to the Fourteenth Amendment.")  Whether a police officer has used excessive force in effecting an arrest "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396.  Circumstances to be considered include (1) the severity of the criminal conduct at issue, (2) whether the suspect posed an immediate threat to the safety of the public and the officer, and (3) whether the suspect was actively resisting arrest. *Id.*  These factors must be viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Even where some degree of force is necessary, gratuitous acts against a person who has been seized may violate the Fourth Amendment's reasonableness standard. *See Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002); *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988) (blow with nightstick to handcuffed, unresisting suspect would be gratuitous and therefore unreasonable).

In the Sixth Circuit, "the law is clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized. *Alkhateeb v. Charter Township of Waterford,* 190 F. App'x 443, 452 (6th Cir. 2006) (citing *Phelps*, 286 F.3d at 301); *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) ("Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest.")  Courts in the Sixth Circuit also have addressed circumstances under which the use of a police K-9 constituted

-18-

excessive force.  For example, in _White v. Harmon_, 65 F.3d 169 (6th Cir. 1995)

(unpublished table decision), the court denied summary judgment on qualified immunity

grounds where an officer brought an inadequately trained dog, who had previously

bitten someone, to the arrest scene and allowed the dog to bite the handcuffed plaintiff.

In _Rainey v. Patton_, 534 F. App'x 391, 397 (6th Cir. 2013), the court concluded that it

was unlawful for an officer to employ a police dog against an unarmed suspect who had

been stopped due to a traffic offense.  Even though the plaintiff had not yet been

handcuffed, she was on the ground and not attempting to flee when the dog was

released. _Id._  The court in _Campbell v. City of Springboro, Ohio_, 700 F.3d 779 (6th Cir.

2012), also found that a plaintiff made a colorable argument for excessive force.

Before an inadequately trained dog apprehended the plaintiff, police officers had

already found the plaintiff facedown on the ground with his arms at his side against an

outbuilding. _Id._ at 787.  In addition, the plaintiff had made eye contact with an officer

and was not actively resisting arrest. _Id._; _see also_ _Drew v. Milka_, No. 2:12-CV-10411,

2013 WL 4029047 at *6 (E.D. Mich. Aug 7, 2013) ("It is clear that ordering a dog bite on

a compliant arrestee violates a clearly established constitutional right.") _aff'd_, 555 F.

App'x 574 (6th Cir. 2014).

        Defendants acknowledge that there are facts in dispute regarding Plaintiff's

encounter with officers and Astor at the side of the house.  Defendants, however,

maintain that Plaintiff's version of the facts is implausible and the Court must reject it.

(Defendants' Brief, Doc. No. 17 at 14-16.)  Defendants cite to _Bell Atlantic Corporation_

_v. Twombly_, 550 U.S. 544 (2007), and _Ashcroft v. Iqbal_, 556 U.S. 662 (2009), for the

-19-

proposition that a plaintiff must allege facts that state a plausible case for relief.

Defendants argue that Plaintiff's account is implausible because an officer would never

remove one handcuff from a suspect given that a loose handcuff could act as a

weapon. (Defendants' Brief, Doc. No. 17 at 14, 16.)  Removal also allows a suspect to

access other weapons on or near his person. (*Id.*)  Additionally, Defendants challenge

Plaintiff's credibility.  They assert that Plaintiff's reasons for fleeing from police are

unreasonable and false because he has given various inconsistent versions of his

reasons for fleeing. (*Id.* at 6, 16.)  Defendants maintain that Plaintiff's claims of officer

abuse should be deemed equally suspect and false. (*Id.*)

Defendants misinterpret the standards set out in *Iqbal* and *Twombly*.  In these

cases, the Supreme Court established a "plausibility" standard for assessing whether a

complaint's factual allegations support its legal conclusions and can survive a motion to

dismiss.  The cases require that a complaint contain enough facts, when accepted as

true, to "state a claim to relief that is plausible on its face."  *Iqbal,* 556 U.S. at 678 (citing

*Twombly,* 550 U.S. 554 at 570).  The plausibility standard requires more than facts

showing that a defendant has possibly acted unlawfully. *Id.*  A plaintiff who pleads facts

that are "merely consistent with a defendant's liability . . . stops short of line between

possibility and plausibility of entitlement to relief." *Id.*  This plausibility standard does not

apply to a court review of conflicting facts set forth in a motion for summary judgment

when the plaintiff's allegations and supporting evidence are sufficient to support a claim

for relief.

Defendants otherwise request that the court weigh the evidence and render

credibility determinations, which is an inappropriate basis for evaluating a motion for summary judgment.  See *Amerson v. Waterford Twp.*, 562 F. App'x 484, 488 (6th Cir. 2014).  At summary judgment, the Court must view all submitted evidence in a light most favorable to the non-moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Unless facts are so blatantly contradicted by evidence in the record, such as by a recording of an incident, so that no reasonable juror could believe them, they remain entitled to an interpretation most favorable to the non-moving party. See *Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011).  In this case, Defendants' factual evidence is not so compelling.  A reasonable juror could believe Plaintiff's account.  Defendants have not come forward with objective evidence, like a video recording of the incident, that blatantly contradicts Plaintiff's version of events.  The veracity of Plaintiff's conflicting statements regarding his flight is an issue of credibility that a jury must evaluate at trial.

Viewing the facts in the light most favorable to Plaintiff, a jury could reasonably find that the use of the K-9 was unreasonable under the circumstances.  Plaintiff has presented evidence showing that before Hornback released the dog, officers had already located Plaintiff and handcuffed his arms behind his back. (Pigott Dep., Doc. No. 17-2 at 80-81.)  Plaintiff was subdued, facedown on the ground. (*Id.* at 84.)  Plaintiff would not have posed a threat to the officers or others at this point.  Based upon the facts viewed in the light most favorable to Plaintiff, no reasonable officer could have believed there was a need to use a police dog after officers had neutralized Plaintiff. Rather, a jury could reasonably conclude that Hornback's employment of the K-9 was

gratuitous, unreasonable, and an excessive use of force.[10]

For the foregoing reasons, the motion for summary judgment on the excessive force claim should be denied.

## IV.

For the foregoing reasons, the Magistrate Judge recommends that Defendants' motion be GRANTED in part and DENIED in part, that is: (1) all constitutional claims asserted against Defendants Boor, Noblet, Sgambellone, Coontz, and John and Jane Doe Officers (1-10) in their individual capacities should be dismissed; (2) to the extent Plaintiff asserts a claim for unreasonable seizure based upon his initial encounter and flight from police that led to his conviction in municipal court for obstructing official business and resisting arrest, the claim should be dismissed; and (3) the excessive force claim against Defendants Hornback and Schacherer in their individual capacities should survive.

*s/ Nancy A. Vecchiarelli*
U.S. MAGISTRATE JUDGE

Date:  December 1, 2015

---

[10]     Defendants rely on two cases to support their argument that the force employed was appropriate under the circumstances.  Accepting Plaintiff's version of the house encounter as true, neither of these cases compels the conclusion that the force used was reasonable.  In *Matthews v. Jones*, 35 F.3d 1046 (6th Cir. 1994), an officer used a police dog to find and apprehend a drunk driver who had fled into a heavily wooded area at night.  In *Robinette v. Barnes*, 854 F.2d 909 (6th Cir. 1988), a police officer relied on a police dog to locate and apprehend a burglary suspect hiding in the dark burglarized building.  The courts in *Matthews* and *Robinette* highlighted the importance of facts establishing that a suspect had failed to surrender and had yet to be apprehended, which justified the use of a K-9 to assist officers. *Matthews*, 35 F.3d at 1048 and 1051; *Robinette*, 845 F.2d at 911 and 913-14.  In this case Plaintiff's version of the facts is readily distinguishable from *Matthews* and *Robinette* as Plaintiff maintains he already had been subdued when Hornback ordered Astor to "apprehend."

-22-

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).